# United States Court of Appeals for the Federal Circuit

2008-1217

AUTOGENOMICS, INC.,

Plaintiff-Appellant,

v.

OXFORD GENE TECHNOLOGY LIMITED,

Defendant-Appellee.

Robert D. Fish, Fish & Associates, PC, of Irvine, California, for plaintiff-appellant. With him on the brief was Josh L. Emory.

Bryan S. Hales, Kirkland & Ellis LLP, of Chicago, Illinois, for defendant-appellee. With him on the brief was Christopher R. Liro.

Appealed from: United States District Court for the Central District of California

Senior Judge Mariana R. Pfaelzer

# United States Court of Appeals for the Federal Circuit

2008-1217

AUTOGENOMICS, INC.,

Plaintiff-Appellant,

v.

OXFORD GENE TECHNOLOGY LIMITED,

Defendant-Appellee.

Appeal from the United States District Court for the Central District of California in Case No. 07-CV-846, Senior Judge Mariana R. Pfaelzer.

———————————————

DECIDED: May 18, 2009

———————————————

Before NEWMAN and MOORE, <u>Circuit Judges</u>, and GETTLEMAN, <u>District Judge</u>.[*]

Opinion for the court filed by <u>Circuit Judge</u> MOORE. Dissenting opinion filed by <u>Circuit Judge</u> NEWMAN.

MOORE, <u>Circuit Judge</u>.

Plaintiff-Appellant Autogenomics, Inc. (Autogenomics) sued Defendant-Appellee Oxford Gene Technology Limited (Oxford) in the United States District Court for the Central District of California for a declaratory judgment of invalidity and non-infringement of claims 9 and 10 of U.S. Patent No. 6,054,270 (the '270 patent). The district court granted Oxford's motion to dismiss for lack of personal jurisdiction. <u>Autogenomics, Inc. v. Oxford Gene Tech., Ltd.</u>, No. SACV 07-846-MRP (C.D. Cal. Jan.

———————————————

[*] The Honorable Robert W. Gettleman, District Judge, United States District Court for the Northern District of Illinois, sitting by designation.

17, 2008). Autogenomics appeals this ruling, as well as the district court's denial of jurisdictional discovery. Because the district court possessed neither general nor specific personal jurisdiction over Oxford, and because the court did not abuse its discretion by denying jurisdictional discovery, we affirm.

BACKGROUND

A. Jurisdictional Facts

Oxford is a British biotechnology company organized under the laws of England and Wales. Oxford owns the '270 patent, which relates to oligonucleotide microarrays for analysis of polynucleotides. Oxford is not registered to do business in California, nor does it have any facilities, assets, employees, or agents there. Autogenomics is a biotechnology company organized under the laws of California, with its main office in Carlsbad, California. Autogenomics uses microarray technology in its business. Autogenomics alleges in support of the district court's personal jurisdiction that Oxford has several contacts with California. The jurisdictional facts alleged by Autogenomics are supplemented, where noted, by uncontradicted evidence presented by Oxford.

1.      Licensing Negotiations Between Autogenomics and Oxford: In early 2006, Oxford contacted Autogenomics regarding the '270 patent, which Oxford contends is infringed by Autogenomics's manufacture and sale of microarray products. In a February 28, 2006 e-mail, Autogenomics expressed interest in taking a license, but provided Oxford with eleven references that it alleged "raise serious issues with regard to novelty and obviousness" of the '270 patent. Oxford responded by e-mail on March 23, 2006, with arguments that the '270 patent was valid over the references, and stated that "we are at a point whereby the commercial negotiations should begin to work to

achieve a license for the Autogenomics product." In July 2007, two Oxford representatives flew to California to meet with representatives of Autogenomics. The parties failed to agree on license terms.

2. Licenses: Oxford entered into non-exclusive licenses with "about ten" California companies with respect to its microarray technology. Although no license terms are in evidence, Autogenomics alleges that one license—not of the '270 patent in particular—to Incyte Pharmaceutics Inc. (Incyte), a California company, is an exclusive license. Oxford claims that it has an "open licensing policy for its patented microarray technology, including the technology covered by the '270 patent," and specifically admits that it granted a non-exclusive license of the '270 patent to Affymetrix Inc., a California company.

3. The Agilent Agreement: According to an Oxford press release and an article from a publically available website, Oxford and Agilent Technologies (Agilent)—a company with offices in California—completed a collaborative agreement in 2007. Autogenomics characterizes this agreement as a joint venture. There is no evidence that this agreement involves a license or has any relationship to the '270 patent. It involves "a collaborative agreement giving [Oxford] access to Agilent's microarray platform, confirming [Oxford] as an Agilent Certified Service Provider, and appointing Agilent as an OEM supplier for [Oxford] designed microarrays." The deal will purportedly allow the two companies to "jointly develop a Centre of (Microarray) Excellence." Oxford executives characterize the relationship as a "close collaboration." The purpose of the deal is to allow Oxford "to become the largest microarray service provider in Europe." An uncontested Oxford declaration states:

[Oxford] has a supply agreement with Agilent that allows [Oxford] to purchase arrays from Agilent for [Oxford]'s use or resale without geographical restriction. There is no joint venture between Agilent and [Oxford]. The agreement between Agilent and [Oxford] is not a distribution agreement whereby Agilent supplies products on [Oxford]'s behalf for or into the California market, or indeed to any other market.

4.  Conferences: Oxford attended three scientific conferences—trade shows in Autogenomics's terminology—in California in 2003, 2005, and 2007. The three conferences dealt with "nanotechnology," "bio-nanotechnology," and "modeling and simulation of microsystems," respectively. At the 2003 conference, Oxford is listed among dozens of "presenting companies." At the 2005 conference, Oxford is listed among dozens of companies under the heading "Past Participant Highlights." At the 2007 conference, Oxford was scheduled to deliver a 20-minute presentation on "[a] method for the highly parallel analysis of gene expression of single cells." In a 2007 company newsletter, Oxford reported that it would attend a fourth conference in California where its booth description characterized Oxford as focusing on "[m]icroarray services and application products" and stated that Oxford "adopts a broad licensing policy for its microarray patents."

5.  Sales: In April 2006, Oxford sold 20 microarrays to a California company for $7,600. According to Oxford, the sale constituted about 1% of its revenue that year. There is no evidence of what relationship, if any, there might be between the sale and the '270 patent. Autogenomics also alleges, without evidentiary support, that Oxford "very likely offered, and possibly contracted to perform" services for numerous California companies, reasoning that Oxford's likely clients are biotechnology companies largely based in California. Oxford provided an uncontested declaration that although "some of the companies" named by Autogenomics "either have a license agreement with [Oxford]

or may seek a license agreement from [Oxford] in the future, the companies . . . are not customers of [Oxford], and are not likely to be."

6. Publication: Oxford published an "application note" on Nature.com, the globally-accessible website of Nature, a United Kingdom scientific publication. The application note describes an Oxford microarray product. Autogenomics characterizes the application note as an advertisement to California companies, noting that the University of California is one of the top ten institutional visitors to Nature.com.

B. Procedural Background

On July 23, 2007, Autogenomics filed a declaratory judgment action against Oxford in the United States District Court for the Central District of California. Autogenomics asked the court to find that claims 9 and 10 of the '270 patent are invalid or unenforceable, and that Autogenomics did not infringe the same claims. On November 27, 2007, Oxford filed a motion to dismiss, arguing that the district court lacked either general or specific personal jurisdiction over it.

On January 17, 2008, the district court ruled that it lacked general jurisdiction because Oxford's contacts with California were insufficient to be the equivalent of having a physical presence within the state. Autogenomics, No. SACV 07-846-MRP at 8-11. The court further ruled that it lacked specific jurisdiction because the declaratory judgment action did not arise from or relate to most of the contacts alleged by Autogenomics, and those contacts that did relate to the declaratory judgment action nonetheless did not contribute to jurisdiction under our holding in Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355 (Fed. Cir. 1998). Autogenomics, No. SACV 07-846-MRP at 11-16. Finally, the court denied Autogenomics the opportunity to

conduct jurisdictional discovery because Autogenomics failed to make a formal motion and failed to show that discovery would demonstrate facts sufficient to constitute a basis for jurisdiction. Id. at 17 n.3. Autogenomics appeals the district court's ruling that it lacked personal jurisdiction over Oxford, as well as the district court's denial of jurisdictional discovery.

DISCUSSION

I.

Personal jurisdiction is a question of law that we review de novo. Avocent Huntsville Corp. v. Aten Int'l Co., 552 F.3d 1324, 1328 (Fed. Cir. 2008) (citing Genetic Implant Sys., Inc. v. Core-Vent Corp., 123 F.3d 1455, 1457 (Fed. Cir. 1997)). "Moreover, we apply Federal Circuit law because the jurisdictional issue is 'intimately involved with the substance of the patent laws.'" Id. (quoting Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995)); see also Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1565 (Fed. Cir. 1994) ("Under [jurisdictional] circumstances such as these, we have held we owe no special deference to regional circuit law.").

"In this case, 'because the parties have not conducted discovery, [Autogenomics] needed only to make a prima facie showing that [Oxford] was subject to personal jurisdiction. As such, the pleadings and affidavits are to be construed in the light most favorable to [Autogenomics].'" Avocent, 552 F.3d 1324, 1328 (quoting Silent Drive, Inc. v. Strong Indus., Inc., 326 F.3d 1194, 1201 (Fed. Cir. 2003)); see also Elecs. for Imaging, Inc. v. Coyle, 340 F.3d 1344, 1349 (Fed. Cir. 2003) ("[W]here the district court's disposition as to the personal jurisdictional question is based on affidavits and other written materials in the absence of an evidentiary hearing, a plaintiff need only to

make a prima facie showing that defendants are subject to personal jurisdiction. In the procedural posture of a motion to dismiss, a district court must accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor." (citation omitted) (second emphasis added)).

"Determining whether jurisdiction exists over an out-of-state defendant involves two inquiries: whether a forum state's long-arm statute permits service of process and whether assertion of personal jurisdiction violates due process." Genetic Implant, 123 F.3d at 1458 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-76 (1985)). "However, because California's long-arm statute is coextensive with the limits of due process, the two inquiries collapse into a single inquiry: whether jurisdiction comports with due process." Inamed Corp. v. Kuzmak, 249 F.3d 1356, 1360 (Fed. Cir. 2001) (citing Dainippon Screen Mfg. Co. v. CFMT, Inc., 142 F.3d 1266, 1270 (Fed. Cir. 1998)); see also Cal. Civ. Proc. Code § 410.10 (Deering 2001).

Autogenomics argues that the district court has personal jurisdiction over Oxford on two bases: general and specific personal jurisdiction. General jurisdiction, on one hand, "requires that the defendant have 'continuous and systematic' contacts with the forum state and confers personal jurisdiction even when the cause of action has no relationship with those contacts." Silent Drive, 326 F.3d at 1200 (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984)). Specific jurisdiction, on the other hand, must be based on activities that arise out of or relate to the cause of action, and can exist even if the defendant's contacts are not continuous and

systematic.  Id. (citing Burger King, 471 U.S. at 472-73).  We will address general jurisdiction and specific jurisdiction in turn.

A.

The district court correctly ruled that it lacked general personal jurisdiction over Oxford.  Oxford does not have contacts with the forum state that qualify as "continuous and systematic general business contacts."  Helicopteros, 466 U.S. at 416.  Rather, this "is a classic case of sporadic and insubstantial contacts with the forum state, which are not sufficient to establish general jurisdiction over the defendants in the forum." Campbell Pet Co. v. Miale, 542 F.3d 879, 884 (Fed. Cir. 2008).  In Helicopteros, the Supreme Court rejected the plaintiff's assertion of personal jurisdiction in Texas where the defendant did not have a place of business in Texas and had never been licensed to do business in the state.  466 U.S. at 416.  The Supreme Court reached this conclusion despite the fact that the defendant "sen[t] its chief executive officer to Houston for a contract-negotiation session; accept[ed] into its New York bank account checks drawn on a Houston bank; purchas[ed] helicopters, equipment, and training services from Bell Helicopter for substantial sums; and sen[t] personnel to Bell's facilities in Fort Worth for training."  Id.  Like the defendant in Helicopteros, Oxford has no actual physical presence or license to do business in California, and nothing here exceeds the commercial contacts that the Supreme Court held were insufficient in Helicopteros.

While acknowledging that the standard for general jurisdiction is "fairly high," Autogenomics argues that Oxford's attendance at several conferences in California approximated a physical presence within the state.  Autogenomics urges us to infer that "Oxford was using its conference appearances to meet with existing and potential

2008-1217                                    8

customers, just as it would if it had an office." We decline to do so. Although we must resolve factual conflicts in Autogenomics's favor, it is entitled to only those inferences that are reasonable. Pennington Seed, Inc. v. Produce Exch. No. 299, 457 F.3d 1334, 1338 (Fed. Cir. 2006). Although it is reasonable to infer that Oxford meets potential customers at conferences, it is not reasonable to infer that this means that Oxford's conference booths are "mobile offices," and ultimately, four conferences over five years constitute only sporadic and insubstantial contacts. See Campbell Pet, 542 F.3d at 881-82 (holding no general jurisdiction despite defendant's attendance at a conference where she demonstrated her products, offered them for sale, took orders, threatened competitors and harassed her competitor's customers).

Autogenomics also points to the Agilent agreement as evidence of continuous and systematic contacts. We cannot reasonably infer from the Agilent agreement that the agreement will cause Oxford to have significantly more contact with California than the defendant in Helicopteros had with Texas—repeated purchases and visits by personnel over a number of years. See 466 U.S. at 418 (holding that "purchases, even if occurring at regular intervals" and visits by personnel in connection with the purchases were insufficient to establish general personal jurisdiction). All of the contacts alleged by Autogenomics, even in combination, are insufficient evidence of continuous and systematic contacts. See Campbell Pet, 542 F.3d at 883-84 (holding that conference attendance in the forum, a cease-and-desist letter sent into the forum, twelve sales in the forum totaling about $14,000 in revenue, and a generally accessible website were insufficient to give rise to general jurisdiction). We similarly considered the litany of inferences that Autogenomics insists we should draw from the jurisdictional facts, and

likewise conclude that they are either unreasonable or even if reasonable, ultimately insufficient. Thus, we conclude that the district court lacked general personal jurisdiction over Oxford.

B.

Where a defendant is not subject to general personal jurisdiction in the forum state, a district court may nonetheless exercise specific personal jurisdiction over the defendant subject to a three part test:

> (1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to those activities, and (3) assertion of personal jurisdiction is reasonable and fair. With respect to the last prong, the burden of proof is on the defendant, which must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable" under the five-factor test articulated by the Supreme Court in Burger King.

Breckenridge Pharm., Inc. v. Metabolite Labs., Inc., 444 F.3d 1356, 1363 (Fed. Cir. 2006) (quoting Burger King, 471 U.S. at 477). "The first two factors correspond with the 'minimum contacts' prong of the International Shoe analysis, and the third factor corresponds with the 'fair play and substantial justice' prong of the analysis." Inamed, 249 F.3d at 1360 (citing Akro, 45 F.3d at 1545); see also Int'l Shoe Co. v. Wash., 326 U.S. 310, 316 (1945).

The district court's decision that it lacked specific personal jurisdiction was largely based on Red Wing Shoe, which held that "cease-and-desist letters alone do not suffice to justify personal jurisdiction" in a declaratory judgment action. 148 F.3d at 1361. The district court concluded that the e-mail and in-person negotiations between Oxford and Autogenomics were "clearly analogous to the 'cease-and-desist' communications at issue in the bevy of cases on this subject." Autogenomics, No. SACV 07-846-MRP at

12-13. With regard to the other jurisdictional facts asserted by Autogenomics, the court acknowledged that we have held that in combination with cease-and-desist communications, other activities can give rise to specific personal jurisdiction. See e.g., Campbell Pet, 542 F.3d at 885-87 (holding that attempts at "extra-judicial patent enforcement" by harming plaintiff's business activities in forum state is a sufficient additional factor to justify the exercise of personal jurisdiction); Breckenridge, 444 F.3d at 1366-67 (holding that entry into an exclusive license with an entity in the forum state is sufficient extra activity to establish jurisdiction); Genetic Implant, 123 F.3d at 1458 (holding that the forum had jurisdiction over the patentee that "contracted with [an exclusive distributor] to sell [the] patented products in [the forum State]" where the agreement was "analogous to a grant of a patent license"); Viam Corp. v. Iowa Exp.-Imp. Trading Co., 84 F.3d 424, 430 (Fed. Cir. 1996) (holding that personal jurisdiction exists where "according to their own submission to this court, [the defendants] have initiated a suit seeking to enforce the same patent that is the subject of this suit against other parties, unrelated to this action, in the same district court"); Akro, 45 F.3d at 1548-49 (holding that exclusive licensing of the accused infringer's competitor in the forum state constituted the required "additional activity" beyond sending warning letters). Here, the district court concluded that the other contacts asserted by Autogenomics did not arise from or relate to the declaratory judgment cause of action. Because it viewed these "other activities" as irrelevant to the question of specific personal jurisdiction, the court concluded that it did not have personal jurisdiction over Oxford.

The district court's decision and the principal briefing on appeal occurred before our decision in Avocent. In that case, we endeavored to reconcile our decisions

regarding personal jurisdiction in declaratory judgment actions, and concluded the following:

> While exclusive licensing agreements and other undertakings that impose enforcement obligations on a patentee or its licensee reflect the kind of "other activities" that support specific personal jurisdiction in a declaratory judgment action, the defendant patentee's own commercialization activity does not. What the patentee makes, uses, offers to sell, sells, or imports is of no real relevance to the enforcement or defense of a patent, because "the federal patent laws do not create any affirmative right to make, use, or sell anything."

Avocent, 552 F.3d at 1335 (quoting Leatherman Tool Group Inc. v. Cooper Indus., Inc., 131 F.3d 1011, 1015 (Fed. Cir. 1997)). Avocent explained that the contacts material to the specific jurisdiction analysis in a declaratory judgment action are not just any activities related to the patent-at-issue. Rather, the relevant activities are those that the defendant "purposefully directs . . . at the forum which relate in some material way to the enforcement or the defense of the patent." Id. at 1336. Thus, courts must examine the jurisdictional facts for conduct whereby the patentee "may be said to purposefully avail itself of the forum and to engage in activity that relates to the validity and enforceability of the patent." Id. In Red Wing Shoe, we observed that the logic of this rule does not flow from the fact that the action is for declaratory judgment because indeed, cease-and-desist letters are the very reason for such an action:

> In the event a patentee casts its net of cease-and-desist letters too widely and entangles some non-infringing products, a plaintiff may have little recourse other than a declaratory judgment action to disentangle its non-infringing business. In those instances, the cease-and-desist letters are the cause of the entanglement and at least partially give rise to the plaintiff's action. In sum, the mirror-image analysis does not account for the legitimate use of a declaratory judgment action as a disentanglement tool. Thus, it ignores the essential fact that in a declaratory judgment action, the patentee is, after all, the defendant.

148 F.3d at 1360. Rather, we explained that:

> Principles of fair play and substantial justice afford a patentee sufficient latitude to inform others of its patent rights without subjecting itself to jurisdiction in a foreign forum. A patentee should not subject itself to personal jurisdiction in a forum solely by informing a party who happens to be located there of suspected infringement. Grounding personal jurisdiction on such contacts alone would not comport with principles of fairness.

Id. at 1360-61.

Our holding in Avocent was that only enforcement or defense efforts related to the patent rather than the patentee's own commercialization efforts are to be considered for establishing specific personal jurisdiction in a declaratory judgment action against the patentee. 552 F.3d at 1336. The dissent suggests that this reading of Avocent renders it in conflict with other precedent of this court. The court in Avocent, however, considered and distinguished the very precedent that the dissent cites. 552 F.3d at 1334-35, 1338-39 (discussing Viam, Campbell Pet, and Red Wing Shoe). In Viam, for example, where this court held personal jurisdiction existed, the patentee had sued another infringer in the same court on the same patent—enforcement efforts in the forum. 84 F.3d at 430. In Campbell Pet, where the court held personal jurisdiction existed, the patentee had enlisted a third party to remove the defendant's products from a trade show that was being held in the forum state—enforcement efforts in the forum. 542 F.3d at 886. In Red Wing Shoe, despite the patentee's thirty-four non-exclusive licensees selling the patented product in the forum State, no personal jurisdiction existed because of an absence of enforcement efforts. 148 F.3d at 1359, 1362.[1]

---

[1] The dissent also suggests that this decision is inconsistent with our court's recent decision in Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. de Equip. Medico, No. 2008-1279, ___ F.3d ___, 2009 WL 1025760 (Fed. Cir. Apr. 17, 2009). Synthes was not a declaratory judgment action against the patent holder but rather an infringement suit brought by the patentee against an accused infringer, where

Although we too are concerned that foreign patentees like Oxford may engage in significant commercialization and licensing efforts in a state while benefiting from the shelter of the Avocent rule, we are nonetheless bound by Avocent. We note, however, that it is not the case that the 50% of all patentees who are foreign "are always immunized from adjudication" as the dissent suggests. Jurisdiction over foreign patentees like Oxford continues to be available in the United States District Court for the District of Columbia. See 35 U.S.C. § 293.

Because principal briefing had been completed in this case prior to our decision in Avocent, on December 19, 2008, we asked the parties to submit supplemental briefing addressing Avocent. Autogenomics had originally argued that Oxford had nine types of contacts with California. In its supplemental brief, Autogenomics concedes that our "holding in Avocent eliminated seven of those nine types of contacts in the context of a declaratory judgment action." Appellant's Supplemental Br. 2. Autogenomics explained that only two of the alleged types of contacts Oxford had with California were still relevant to the specific jurisdiction inquiry: the Agilent agreement and the licenses. Id. at 2-3.

First, Autogenomics asserts that the Agilent agreement is sufficient to establish jurisdiction over Oxford. We disagree. Although Agilent is a California company, and the agreement was created to pursue the field of microarrays, there is nothing in

commercialization-type contacts are highly relevant to personal jurisdiction. By contrast, in Avocent we held that "[w]hat the patentee makes, uses, offers to sell, sells, or imports is of no real relevance to the enforcement or defense of a patent." 552 F.3d at 1335. The dissent may be correct that Red Wing Shoe rested not on this reasoning, but rather on principles of fairness. See 148 F.3d at 1360-61. Regardless of whether Avocent went further than Red Wing Shoe required, it is now clear and binding precedent.

evidence, nor would it be a reasonable inference, to suggest that this agreement involves the '270 patent or is "analogous to a grant of a patent license." Genetic Implant, 123 F.3d at 1458.

Second, Autogenomics argues that we should infer that Oxford gave an exclusive license that relates to the '270 patent. As support for this contention, Autogenomics argues that the allegedly exclusive Incyte license means that the following declaration of Oxford's director of licensing and business development is false: "[Oxford] has an open licensing policy for its patented microarray technology, including the technology covered by the '270 patents. All of [Oxford's] licenses are non-exclusive . . . ." Even though the Incyte license "does not relate to the patent-at-issue in our case," Autogenomics argues that because of this apparent inconsistency, we should infer that Oxford is hiding an exclusive license of the '270 patent. We disagree because although the inconsistency greatly weakens the strength of Oxford's declaration, it is nonetheless undisputed that there are numerous non-exclusive licenses of the '270 patent. Because of this, it cannot be a reasonable inference that there is also an exclusive license of the same patent. We therefore conclude that the district court does not have specific personal jurisdiction over Oxford because Autogenomics has failed to allege sufficient activities "relat[ing] to the validity and enforceability of the patent" in addition to the cease-and-desist communications. Avocent, 552 F.3d at 1336.

II.

Autogenomics also appeals the district court's denial of jurisdictional discovery. We review the district court's denial of discovery, an issue not unique to patent law, for abuse of discretion, applying the law of the regional circuit. Diego, Inc. v. Audible, Inc.,

505 F.3d 1362, 1370 (Fed. Cir. 2007) (citing Qualls v. Blue Cross, Inc., 22 F.3d 839, 844 (9th Cir. 1994)); see also Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1154 (9th Cir. 2006) ("We review a district court's decision to grant or deny discovery on jurisdictional facts for abuse of discretion."). "A reviewing court will not disturb a denial of additional discovery unless there is 'the clearest showing' that the denial will result in 'actual and substantial prejudice to the complaining litigant' (e.g., 'a reasonable probability that the outcome would have been different had discovery been allowed')." Diego, 505 F.3d at 1370 (quoting Laub v. U.S. Dep't of Interior, 342 F.3d 1080, 1093 (9th Cir. 2003)).

In this case, there is no denial of a motion for jurisdictional discovery for us to review because there was no formal motion for jurisdictional discovery. According to an uncontroverted declaration by counsel for Oxford, on November 26, 2007, counsel for Oxford contacted counsel for Autogenomics to warn him of the pending motion to dismiss for lack of personal jurisdiction. After discussing arguments relating to jurisdiction, counsel for Autogenomics raised the possibility of jurisdictional discovery, and asked for the contact information of relevant people at Oxford. Counsel for Oxford identified two people and indicated that he was willing to discuss the issue further, even after Oxford filed its motion to dismiss. Counsel for Autogenomics said that he would call back within a few days, but he did not. Oxford filed its motion to dismiss on November 27, 2007.

In its opposition to Oxford's motion to dismiss, filed December 21, 2007, Autogenomics stated, without elaboration, that "[i]n the event that the Court is not completely convinced of jurisdiction, Autogenomics hereby requests that the Court grant

limited discovery." On December 28, 2007, the district court attempted to contact counsel for Autogenomics to advise him of how to properly request jurisdictional discovery. On January 2, 2008, counsel for Autogenomics returned the court's telephone call, leaving a message for the clerk. At the hearing for the motion to dismiss on January 14, 2008, Autogenomics reiterated its request for jurisdictional discovery. The district court noted that it never received the required formal motion. In its January 17, 2008 ruling, the court refused to grant jurisdictional discovery. The court found that the suggestions at oral argument and in the opposition brief were insufficient, and regardless, that Autogenomics had "not shown, with any degree of specificity, that discovery would 'demonstrate facts sufficient to constitute a basis for jurisdiction.'" Autogenomics, No. SACV 07-846-MRP at 17 n.3 (quoting Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 430 n.24 (9th Cir. 1977)).

The district court did not abuse its discretion by denying jurisdictional discovery. As an initial matter, the district court is correct that under Ninth Circuit law, it is not necessarily an abuse of discretion to reject a request for jurisdictional discovery because no formal motion was made. Sopcak v. N. Mountain Helicopter Serv., 52 F.3d 817, 819 (9th Cir. 1995) (holding that district court did not abuse its discretion by denying discovery where "rather than moving for extension of time to oppose the dismissal motion, the Appellants filed an opposition which stated in part: '[h]owever, if the court believes that there is not sufficient evidence to support plaintiffs' jurisdictional allegation, plaintiffs respectfully request an opportunity to conduct discovery'"). Autogenomics attempts to distinguish Sopcak by arguing that it did not become aware that jurisdictional discovery would be necessary until "days before filing its opposition."

It is undisputed, however, that Autogenomics considered and discussed jurisdictional discovery issues with opposing counsel before Oxford filed its motion to dismiss. Moreover, by proactively contacting counsel for Autogenomics, the judge expressed a willingness to consider a formal motion even after Autogenomics made its unsupported request in its opposition brief. And of course, Autogenomics could have moved for an extension of time as the Ninth Circuit suggested in Sopcak. Autogenomics "can not now complain that the court erred by not allowing them to conduct eleventh-hour discovery upon an adverse ruling." Id.[2]

Furthermore, as the district court noted, "[a]n appellate court will not interfere with the trial court's refusal to grant discovery except upon the clearest showing that the dismissal resulted in actual and substantial prejudice to the litigant; such a refusal is not an abuse of discretion when it is clear that further discovery would not demonstrate

---

[2] Autogenomics relies on Commissariat a l'Energie Atomique v. Chi Mei Optoelectronics Corp., 395 F.3d 1315, 1323 (Fed. Cir. 2005), which applied Third Circuit law to hold that "plaintiffs did not waive their right to discovery, but preserved the issue by, [a] initially requesting discovery in their opposition to the motion to dismiss, [b] a request that was reiterated during oral argument, and [c] reasserted . . . in greater detail in their motion for reconsideration." This rule, regardless of its merits, cannot overrule the Ninth Circuit's law here. Even if this rule were applicable, Autogenomics failed at any point, much less in a motion for reconsideration, to provide the district court "greater detail," much less any detailed reasons at all for seeking discovery.

Furthermore, although we held in Commissariat that "[i]n determining the relevance of a request for jurisdictional discovery, we apply Federal Circuit law," that is not our task here. 395 F.3d at 1323. Rather, we are making a threshold decision of whether the denial of discovery was an abuse of discretion where the plaintiff failed to make a formal motion and failed to articulate any reasons for why discovery was necessary. See id. at 1322 ("On procedural issues such as the timeliness of discovery requests, we are guided by the law of the regional circuit in which the district court sits."). This is a question controlled by Ninth Circuit law. Indeed, we cannot evaluate the "relevance" of Autogenomics's request because it provided the district court with no reasons for its request or particular areas to which discovery would be directed. In Commissariat, by contrast, the plaintiff "clearly made a sufficient threshold showing to merit jurisdictional discovery." Id. at 1323. Autogenomics made no such showing.

facts sufficient to constitute a basis for jurisdiction." Wells Fargo, 556 F.2d at 430 n.24; see also Laub, 342 F.3d at 1093 ("Prejudice is established if there is a reasonable probability that the outcome would have been different had discovery been allowed."). Autogenomics did not make, either in its opposition brief or at the motion hearing, a showing that further discovery would elucidate the facts necessary to prove that the court had personal jurisdiction. Such a showing is especially important where, as here, the defendant enters declarations into evidence specifically denying certain jurisdictional allegations. Teracom v. Valley Nat'l Bank, 49 F.3d 555, 562 (9th Cir. 1995) ("[W]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by defendants, the Court need not permit even limited discovery . . . ."). Only now, on appeal, does Autogenomics explain how discovery could help establish the court's jurisdiction. We need not evaluate the merits of these arguments because they were never made to the district court, and thus do not have any bearing on our review of the district court's decision for abuse of discretion. Nor do we agree with Autogenomics that the arguments are so "obvious" that the court should have reached them as reasonable inferences in view of the jurisdictional facts it had before it. Therefore, we conclude that the district court acted within its discretion by denying Autogenomics's request for jurisdictional discovery.

## CONCLUSION

The district court possessed neither general nor specific personal jurisdiction over Oxford, and the court did not abuse its discretion by denying Autogenomics's request for jurisdictional discovery. The judgment below is

## AFFIRMED.

# United States Court of Appeals for the Federal Circuit

2008-1217

AUTOGENOMICS, INC.,

Plaintiff-Appellant,

v.

OXFORD GENE TECHNOLOGY LIMITED,

Defendant-Appellee.

Appeal from the United States District Court for the Central District of California in Case No. 07-CV-846, Senior Judge Mariana R. Pfaelzer.

NEWMAN, <u>Circuit Judge</u>, dissenting.

The Federal Circuit again restricts United States parties from access to our courts when a United States patent is owned by a foreign entity. The court rules that the foreign patent owner is not subject to suit in California despite its commercial presence in California including the grant of at least ten patent licenses to companies in California; despite a manufacturing venture of the patent owner with a California-based company to produce and sell microarrays designed by the patent owner; despite participation by the patent owner with respect to the patented technology in trade shows and scientific meetings in California; and despite the patent owner's threats of infringement against Autogenomics, a California company whose accused activities are conducted in California. On the entirety of these contacts, jurisdiction of this declaratory

judgment action was proper in the Central District of California. From my colleagues' contrary ruling, I respectfully dissent.

## DISCUSSION

It is not disputed that there is a "case of actual controversy" in accordance with the Declaratory Judgment Act, 28 U.S.C. §2201(a), between the patent owner Oxford Gene Technology Inc., a British company, and the plaintiff Autogenomics. The only question is whether the requirements of personal jurisdiction have been met in California, the resident forum of Autogenomics, recognizing that Oxford is not registered to do business in any of the United States.

Where a foreign defendant has not consented to suit in a forum, the inquiry into personal jurisdiction turns on a trio of criteria, generally designated as purposeful availment, relatedness, and reasonableness. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-77 (1985); Akro Corp. v. Luker, 45 F.3d 1541, 1545 (Fed. Cir. 1995). First, the defendant must have purposefully availed itself of the forum by conducting activities in the forum. Second, the plaintiff's claim must arise from or be related to the defendant's activities in the forum. And third, the court's exercise of personal jurisdiction must comport with the principles of due process and fairness.

Autogenomics readily made a prima facie showing as to these criteria, for Oxford owns several United States patents, including the patent that is the subject of this declaratory action, and is exercising its United States patent rights through approximately ten licensees in California. Autogenomics states that Oxford has entered into a manufacturing venture with the California company Agilent, whereby Agilent serves as a California-based supplier of microarrays designed by Oxford. Oxford's

2008-1217                                        2

employees have personally exhibited the Oxford technology at trade shows in California and publicized the availability of licenses for Oxford's United States patents. The record shows sale of Oxford microarray products to at least one customer in California. Oxford employees traveled to California and negotiated with Autogenomics in that forum. In addition, California is the primary site of Autogenomics' business, the forum in which the accused infringing activities are conducted, and in which Oxford's threatened enforcement of its patent would occur. Many of Oxford's contacts with California relate directly to the '270 patent, the subject of this lawsuit.

The reasonableness inquiry applies to both defendant and plaintiff, invoking "notions of fair play and substantial justice," Akro, 45 F.3d at 1546, as measured by factors such as those discussed in Burger King:

> [C]ourts in appropriate cases may evaluate the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies.

471 U.S. at 477 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980)) (quotation marks omitted). Considerations of reasonableness give effect to the equitable authority of courts to provide access to adjudication when such is warranted, while protecting both sides from unfair burdens. Considerations of fairness and justice are central to the due process analysis, the Court observing that "[t]hese considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." Burger King, 471 U.S. at 477 (citing Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 780 (1984); Calder v. Jones, 465

U.S. 783, 788-89 (1984); <u>McGee v. International Life Ins. Co.</u>, 355 U.S. 220, 223-24 (1957)).

Autogenomics brought this declaratory judgment action in the forum of its corporate residence and principal place of business, the location of the activities that Oxford says infringe its United States patents. The compulsory counterclaim of infringement would center on activities in the Central District of California. No other forum has been asserted by Oxford to be more convenient; indeed, the entire relationship between Oxford and Autogenomics has been in the California forum, which is a primary locus of the biotechnology industry in which both parties are engaged. All of these factors are relevant to the inquiry of whether "the quality and nature of the activity in relation to the fair and orderly administration of the laws" is sufficient for a forum to exercise jurisdiction. <u>International Shoe Co. v. Washington</u>, 326 U.S. 310, 319 (1945).

Personal jurisdiction of owners of United States patents has been recognized in circumstances no closer to the forum than those here. In <u>Campbell Pet Co. v. Miale</u>, 542 F.3d 879 (Fed. Cir. 2008), this court held that the patentee, a corporation having a California residence, was nonetheless subject to personal jurisdiction in the state of Washington, upon having attended a trade show in Washington and complained about the plaintiff's display, then writing to the plaintiff in Washington, charging infringement. <u>Id.</u> at 886. In <u>Viam Corp. v. Iowa Export-Import Trading Co.</u>, 84 F.3d 424 (Fed. Cir. 1996), this court held that the Central District of California had personal jurisdiction of the Italian corporation SPAL, which owned a United States patent. SPAL had no United States residence, although it had an exclusive distributor resident in Iowa, and its only

activity involving California was the importation and sale of the patented goods in California by its distributor; but this court held: "There is sufficient connection between [the non-resident patent owner's and its distributor's] activity and the litigation to satisfy [the minimum contacts] prong of the International Shoe Due Process test." Id. at 429. This court determined that the foreign patentee "ha[d] 'purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" Id. at 428 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). The court also observed that "allowing the forum to exercise jurisdiction cannot be said to be unfair." Id. at 430.

The comparison with Viam is informative, for both Oxford and SPAL are foreign owners of United States patents who do business in the forum without themselves residing in the forum. In Oxford's case its patented inventions are placed in United States commerce through manufacture by United States licensees, providing a more direct connection with United States commerce than the importation of products manufactured offshore. Oxford's contacts with the California forum are not "random, fortuitous, or attenuated," Burger King, 471 U.S. at 475 (internal quotation marks omitted), but are the normal course of Oxford's business of exploiting and profiting from its United States patents.

Today's ruling is also incompatible with this court's recent decision in Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. de Equip. Medico, No. 2008-1279, __ F.3d __, 2009 WL 1025760 (Fed. Cir. April 17, 2009). Synthes involved a patent infringement suit filed by a United States plaintiff against a Brazilian entity whose products were offered for sale at trade shows in the United States, although no actual sales of the

allegedly infringing products were made in the United States. The Brazilian company had no office or subsidiary or licensee in the United States, although it purchased United States products for use or resale in Brazil. This court applied Federal Rule of Civil Procedure 4(k)(2),[1] the "federal long-arm statute," and held that the entire United States is an available forum. 2009 WL 1025760 at *9. The court considered the entirety of the contacts, and found them sufficient to establish specific personal jurisdiction over the Brazilian defendant. Id. at *10-*13. The court stressed that the Brazilian company's attendance at trade shows in the United States included display of an allegedly infringing product. Id. at *10. My colleagues assert that Synthes is not relevant merely because the foreign party was the accused infringer, rather than the patentee. See maj. op. at 13 n.1. But this court has previously recognized that this is not a valid means of distinguishing cases, for Viam relied on the stream of commerce to establish personal jurisdiction, see Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1566 (Fed. Cir. 1994), although the foreign defendant in Beverly Hills Fan was the accused infringer rather than the patentee. See Viam, 84 F.3d at 428 ("All the reasons for adopting and applying the stream of commerce theory to the question of personal jurisdiction over an out-of-state alleged infringer as defendant, fully explored in Beverly Hills Fan, are equally applicable to the same question regarding an out-of-state

---

[1]     Rule 4(k)(2) states:

(2)     Federal Claim Outside State-Court Jurisdiction
        For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
        (A)     the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
        (B)     exercising jurisdiction is consistent with the United States Constitution and laws.

patentee as defendant.").

On considering the interests of both sides to this dispute, in light of precedent, it has not been shown that subjecting Oxford to suit in California is either unreasonable or unfair. My colleagues on this panel hold that the California forum has neither general nor specific jurisdiction over Oxford, although the Central District of California is the forum most directly related to Oxford's activities in the United States, as well as being the locus of the accused infringement. Nonetheless, this court immunizes Oxford, the owner of a United States patent, from resolution of the patent dispute. This court has recognized that "[j]ust as a state has a substantial interest in preventing patent infringement within its borders, it also has a substantial interest in protecting its residents from claims of patent infringement that may be unwarranted." Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found., 297 F.3d 1343, 1356 (Fed. Cir. 2002).

Depriving Autogenomics of the opportunity to resolve the threat of infringement is contrary to the purpose and principles of the Declaratory Judgment Act. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-32 (2007) (explaining that public policy favors declaratory challenge to adverse patents by persons whose substantial rights may be affected).

My colleagues on this panel, in support of their ruling that Oxford cannot be sued in California, cite this court's recent holding in Avocent Huntsville Corp. v. Aten International Co., 552 F.3d 1324, 1335 (Fed. Cir. 2008). However, if Avocent is read to bar this suit, it is in conflict with precedent of this court and the Supreme Court, as discussed therein. See id. at 1341-51 (Newman, J., dissenting). Viam held that the

foreign patent owner's sales (through a distributor) in the forum sufficed to support personal jurisdiction, while Avocent ruled that such sales are irrelevant to personal jurisdiction. This direct conflict simply adds confusion; however, this court remains bound by the "rule of interpanel accord," which is that in the event of conflict, real or perceived, the earlier decision controls until the conflict is resolved. See, e.g., Newell Cos. v. Kenney Mfg. Co., 864 F.2d 757, 765 (Fed. Cir. 1988).

The panel majority also cites the statement in Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355 (Fed. Cir. 1998), that "[p]rinciples of fair play and substantial justice afford a patentee sufficient latitude to inform others of its patent rights without subjecting itself to jurisdiction in the foreign forum," id. at 1360-61, principles with which I fully agree. However, while the Red Wing court made this statement to explain why personal jurisdiction does not arise from infringement letters, the court seems to have confused personal jurisdiction with the showing of a "case or controversy" that is needed to establish subject matter jurisdiction for a declaratory judgment action. Whether accusations of infringement are actionable in a specific case has no relation to where suit may be brought when a case or controversy does indeed exist, as in this case.

The evolving law under MedImmune facilitates challenge to adversely held patents. See, e.g., SanDisk Corp. v. STMicroelectronics, Inc., 480 F.3d 1372, 1380 (Fed. Cir. 2007) ("The Supreme Court's opinion in MedImmune represents a rejection of our reasonable apprehension of suit test."). The court's ruling today negates this development, by unduly narrowing personal jurisdiction to bar an action that the Court has advised should be available under the Declaratory Judgment Act. Although

undoubtedly there are circumstances in which a foreign patent owner can properly avoid jurisdiction, here the foreign patentee is actively and forcefully using its United States patents in a competitive context within the forum of this suit. Equity favors the reasonableness of permitting Autogenomics to resolve the threat, instead of continuing to face the uncertainty of liability and business risk, at the whim of the patent owner.

This is not a trivial question. The PTO reports that 50.3% of the patents granted in 2008 were issued to foreign patentees. See USPTO, Extended Year Set–Historic Patents By Country, State, and Year—All Patent Types (December 2008), available at http://www.uspto.gov/web/offices/ac/ido/oeip/taf/cst_allh.htm. Thus restriction on the availability of declaratory judgment actions against foreign-owned patents is of economic significance. As this court stated in Viam, it cannot have been contemplated that activities otherwise subject to federal jurisdiction, are always immunized from adjudication when the patent owner's address is offshore. 84 F.3d at 429-30. The panel majority asserts that, at a minimum, the United States District Court for the District of Columbia remains a fall-back forum, see 35 U.S.C. §293. It is surely useful that the District of Columbia court can have jurisdiction "to take any action respecting the patent or rights thereunder." Id. That is not the issue herein, nor does §293 override personal jurisdiction in a more suitable and convenient forum. See Deprenyl Animal Health, 297 F.3d at 1353 (section 293 "represents an important Congressional judgment that in exchange for obtaining the benefits of a United States patent, it is appropriate to require foreign patentees to submit to broader jurisdiction in United States Federal Court than that to which they would otherwise be subject."). It is not explained why a California plaintiff should have to resort to a distant forum, which is not alleged to have meaningful

contacts with either party, to resolve a dispute that centers upon actions by both the plaintiff and the foreign patentee in the state of California. I take note that Oxford has not suggested transfer to the District of Columbia; the Oxford position is that it cannot be sued.

The court's decision that Oxford cannot be brought before the court in the Central District of California is contrary to law, precedent, and policy. I respectfully dissent.